UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

ROBERT EDWARD FRITTS,     )
     )
     Petitioner,     )
     )
v.     )     No.     3:19-CV-031-RLJ-JEM
     )
GRADY PERRY,     )
     )
     Respondent.     )

**MEMORANDUM OPINION**

A jury convicted Petitioner of first-degree murder based on his act of killing his mother-in-law ("the victim") with a hatchet after spraying her in the face with white paint [Doc. 13-1 p. 5]. *State v. Fritts*, No. E2012-02233-CCA-R3-CD, 2014 WL 545474, at *2, *4, *12, *13 (Tenn. Crim. App. Feb. 10, 2014), *perm. app. denied* (Tenn. Sept 19, 2014) ("*Fritts I*"). Despite overwhelming evidence of Petitioner's guilt for this crime, including police finding the victim's blood on the jeans and a shoe Petitioner wore on the day of the murder, the discovery of a partial bloody shoeprint in the house where the murder occurred that was consistent with the right shoe Petitioner was wearing on the day of the murder, and Petitioner's confession of his guilt for the murder to a fellow inmate, Petitioner insisted to his trial counsel that he was not guilty of or present for the murder. *Id.* at *10, *13; *Fritts v. State*, No. E2017-00996-CCA-R3-PC, 2018 WL 2357371, at *3, *4 (Tenn. Crim. App. May 24, 2018), *perm. app. denied* (Tenn. Sept. 13, 2018) ("*Fritts II*").

Petitioner, a state prisoner, now seeks relief under 28 U.S.C. § 2254 from this conviction [Doc. 1]. Respondent filed a response in opposition to Petitioner's petition for § 2254 relief [Doc. 15] and the state court record [Docs. 14, 17]. Petitioner filed a reply [Doc. 22].

1

After reviewing the relevant filings and the state court record, the Court finds that Petitioner is not entitled to habeas corpus relief under § 2254. Accordingly, no evidentiary hearing is warranted, *see* Rules Governing § 2254 Cases, Rule 8(a) and *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007), the habeas corpus petition will be **DENIED**, and this action will be **DISMISSED**.

## I. BACKGROUND

In affirming Petitioner's first-degree murder conviction on direct appeal, the Tennessee Court of Criminal Appeals ("TCCA") summarized the evidence introduced in the trial as follows:

> John Busler testified that he was married to the murdered victim, Teresa Busler, and that they lived at 128 Big Valley Road in Andersonville, Tennessee. Although he and the victim did not have any children together, the victim had one child, Dawn Stutler,[1] who was six years old at the time that he and the victim married. Several years later, Stutler moved out of the home until the State obtained custody of her. While in the custody of the State, Stutler had a child, B., when she was seventeen years old. Although the child was initially placed in the State's custody, Mr. and Mrs. Busler asked for and received custody of B. through the Department of Children's Services when the child was two years old.
>
> Mr. Busler said Dawn Stutler had "sporadic" contact with B. until she and her husband Robert Fritts, the Defendant–Appellant, moved into the Busler's home. At the time, neither Stutler nor Fritts were employed. The Buslers were told that Stutler was pregnant with Fritts's child approximately one month after she and Fritts moved in with them. John Busler and the victim often encouraged Fritts to find employment.
>
> Mr. Busler said that the Sunday before the victim's murder, Fritts asked him if he could get a ride to Knoxville on Tuesday so that he could go to the West Town Mall. That Tuesday, March 6, 2007, Mr. Busler awoke at 5:55 a.m. for work. At 6:20 a.m., he asked Fritts if he was still planning to ride to Knoxville with him, and Fritts told him that he was not planning on going and rolled back under the covers. Mr. Busler informed his wife that Fritts was going to stay at the house that day. He remembered that the victim was unhappy about Fritts staying at the house and believed that she was concerned because Stutler and Fritts often argued. Mr. Busler

---

[1] The TCCA referred to this individual as Dawn Stutler or Stutler in its opinion affirming Petitioner's conviction. *Fritts I*, at *1 n.1. But in its opinion denying Petitioner's appeal of the denial of his petition for post-conviction relief, the TCCA referred to her as Mrs. Fritts. *See generally Fritts II*. For purposes of clarity, the Court will refer to this individual as Dawn Stutler.

told the victim that he believed that it would be peaceful at the house that day because Stutler was not at home.

When Mr. Busler left for work at 6:25 a.m., he locked the doors to the house. He arrived at work at 6:55 a.m. and remained there until 4:36 p.m. He only left work one time for approximately ten minutes to walk across the street to a deli during his lunch hour before he returned to work. When he left work at 4:36 p.m., he drove home and arrived there at approximately 5:05 p.m.

When he got home, Mr. Busler used his key to open the door and realized that the deadbolt and the door lock were both unlocked. He walked into the house and looked for the victim so that he could drive her to work. As he walked through the kitchen to their bedroom, he saw what appeared to be a smear of blood on the floor. When he approached the doorway to their bedroom, he saw the victim's bare feet. He entered the bedroom and saw "blood all over the bed and walls" and his wife's deceased body.

Mr. Busler touched the victim, who was not moving. He saw that she had a severe head wound, and when he touched her head, he got blood and brain tissue on his left hand. Mr. Busler opened the door to B.'s room to check on her and saw that B. was fine. He then went to his neighbor's home to call 911 because he did not have a landline in his home. Mr. Busler called 911 and then returned home with the neighbor. He said he believed that the victim was still alive and checked on B. again before going outside to wait on the ambulance. The first officer to arrive was a female officer. Mr. Busler told this officer that he had come home to find his wife severely injured, and the officer told him to remain outside while she went inside the home to investigate. He stated that he remained outside the house from that point forward.

Mr. Busler said that the only weapons he had at his house for protection were a hatchet and a hunting knife that he kept between the mattress and box springs on his side of the bed. He stated that the last time he had seen the hatchet and knife was three or four weeks before the victim's death and that they had both been under his mattress at the time. Mr. Busler stated that he had actually checked on the location of the hatchet and the knife because someone had used a knife to break the lock on a glass gun cabinet in one of the guest bedrooms of his house:

> I had a wooden glass door gun cabinet in the middle of our bedroom, our extra bedroom, which was kind of being used as a storage area. I was in that room and noticed that there were two doors at the bottom of the cabinet that locked, and the one door was locked, it had a small key in it. It had been tampered with and broken loose

3

and opened. I was the only one that had a key to it. So I just got to wondering how that could have been opened and with the markings that were around the lock, it looked like there were some type of sharp object so I went to look for the knife to see if it had been used. The tip of the knife blade indeed was bent a little bit so I checked both items, the hatchet and the knife, when I looked at the knife.

Mr. Busler said that he discussed the bent knife tip with the victim and Stutler but did not remember discussing it with Fritts.

After officers arrived at his home on March 6, 2007, Mr. Busler was taken to the Anderson County Sheriff's Department, where he gave a statement about what had occurred that day. After giving the statement, he went to his brother's house and then went to the neighbor's house, where the Department of Children Services had temporarily placed B. until he gave his statement. He picked up B. and returned to his brother's house. Mr. Busler stated that he was allowed to return home on March 7, 2007. He immediately looked for his hatchet, but it was not under the mattress. However, on March 13, 2007, an officer with the Anderson County Sheriff's Department asked him to identify a hatchet and the hatchet's sheath that were found in the attic above the garage. He identified the hatchet and its sheath as his. Mr. Busler later found a notebook belonging to Fritts while he was cleaning the house. He stated that the notebook also contained Stutler's writing and that there were portions of the notebook that looked as if Stutler and Fritts had been writing notes to one another.

Mr. Busler stated that he had been employed as a painter before taking the job at Feroleto Steel. He said he was working on his home and doing paint jobs at other homes on the weekends, which was why there was a paint can and paint brushes in the home as well as a can of spray paint in the kitchen at the time of the victim's death.

Mr. Busler acknowledged that there was some discord in the household during the time period that Fritts and Stutler lived with him and the victim because he knew that either Fritts or Stutler had used his knife to break into the gun cabinet. Mr. Busler stated that he had told Fritts that he needed to find a job and take responsibility for the well-being of his family. He stated that Stutler's pregnancy did not create any problems in the household and that there was never any animosity between the victim and Fritts. However, he said that the victim was concerned that Fritts and Stutler were living with them and neither had secured a job or could take care of themselves. He described his wife, the victim, as "a very giving person, a very loving person, very tolerant."

4

Robert Mansfield, a sergeant with the Anderson County Sheriff's Department, testified that he was dispatched to the crime scene in this case for the purpose of locating the murder weapon. He was told to search the scene for anything that would be consistent with the wounds suffered by the victim. When Sergeant Mansfield entered the home, he walked to the kitchen area and immediately noticed the washer and dryer. He thought it was possible that the perpetrator might have attempted to clean the crime scene. When he examined the exterior of the washing machine, he saw areas that appeared to be dried [blood]. When he opened the washer's lid, he saw additional stains that appeared to be wet blood. He noticed that there were clothes inside the washing machine and there were red spots that appeared to be blood on the plastic part of the washer's agitator. He talked to Special Agent William Corbit of the Tennessee Bureau of Investigation (TBI) about the things he had seen inside and outside the washing machine, which were documented. He then watched the officers unload the washing machine, which contained several items of clothing as well as several towels with human tissue and bone fragments on them.

Bill Breeding, a detective supervisor with the Anderson County Sheriff's Department, testified that he was dispatched to a home at 128 Big Valley Road in Andersonville, Tennessee in March 2007. When he entered the home, he observed a deceased woman lying on the floor next to a bed in a bedroom located off of the kitchen. Detective Breeding stated that he walked outside to talk to Mr. Busler, called Dawn Stutler, and tried to find Fritts. Mr. Busler informed him that he owned a hatchet, which he kept in his bedroom. Detective Breeding stated that he was present several days later when other officers found the hatchet and its sheath in the Busler's attic over the garage. He stated that Mr. Busler identified the hatchet and its sheath as belonging to him.

On March 6, 2007, Detective Breeding talked to Fritts on the phone several times and attempted to get Fritts to come to the crime scene. He later talked with Fritts at the sheriff's department about what had happened at the victim's house that day and what Fritts's actions had been that day. Detective Breeding was present when all of Fritts's clothing, including a red hoodie, Reebok tennis shoes, socks, and shoe strings, were collected. He was also present when officers collected cheek swabs and nail clippings from Fritts. He stated that officers also collected cheek swabs from Dawn Stutler.

When Detective Breeding returned to the Busler's home, he was asked to look inside the washing machine and observed "traces of a red substance" and "hard objects" that looked like pieces of bones. He removed these items from the washing machine and gave them to another officer to collect as evidence. He also collected some towels from the washing machine.

5

Dr. Adele Lewis, the assistant medical examiner who supervised the victim's autopsy, was declared an expert in the field of forensic pathology. She said that during the autopsy, some hairs were found in one of the victim's hands and a substance that appeared to be paint was found on her face and on one of her hands. In addition, she observed that the victim's clothing contained a significant amount of blood. Once she cleaned the victim's body, she found several abrasions on the back of the victim's hand and wrist, which were blunt force injuries. She observed that the victim had a black right eye that occurred at or near the time of her death and some bleeding in the white part of the left eye. In addition, the victim had a large wound to the back of the head, a chop-type injury, with brain matter coming out of it. Dr. Lewis stated that this wound was the result of a combination of blunt and sharp force injuries on the head, which could have been caused by a boat propeller, a hatchet, an axe, or a machete. Dr. Lewis determined that the victim had suffered at least eleven different blows based on her visible wounds and that these wounds were the result of a substantial amount of force akin to a car wreck. She said the victim had sustained a large bruise to her calf and had an array of crescent shaped bruises on the back of her left shoulder, which were consistent with bite marks. In addition, the victim had an array of oval bruises on the back left side of the victim's neck near her ear, which were consistent with a suction injury commonly referred to as a "hickey." She noted that the victim also suffered an oval shaped skull fracture near the top of her head that was created by a blunt force object. Dr. Lewis stated that the victim's cause of death was "multiple sharp and blunt force injuries to the head," and the victim's manner of death was homicide. She stated that the hatchet found in the attic above the victim's garage could have caused the injuries to the victim in this case. Dr. Lewis acknowledged that she could only roughly estimate the time of a victim's death and said that the victim's death in this case "occurred some time within the 24 hours prior to her discovery being found dead, which was March 6, 2007, at 5:15 p.m."

Kenneth Campbell, a detective with the Anderson County Sheriff's Department, testified that he responded to a call at the Busler's home on March 6, 2007. He stated that he went to the Git'N'Go Market to review the store's surveillance tapes to determine if Fritts had been in the store around the time of the victim's death. He and another officer reviewed these tapes and observed Fritts buying a soda and exiting the store on March 6, 2007, around 4:00 p.m. He also talked with a female employee at this store.

On March 13, 2007, Detective Campbell returned to the Busler's home to continue to look for the murder weapon. After searching the home, Officer Campbell and Detective Jones searched the attic above the garage and found a hatchet lying on

the floor of the attic. He stated that they did not touch or move the hatchet and when Agent Corbit arrived at the scene, he and Detective Ralph James collected it.

Special Agent William Corbit testified that he was contacted on March 6, 2007, about the victim's death and was asked to assist in investigating the case. After meeting with Mr. Busler and obtaining his consent to search the home, Agent Corbit supervised the interviews of some witnesses at the sheriff's department. He stated that Fritts voluntarily came to the sheriff's department to be interviewed and was not in custody at that time. Prior to the interview, Agent Corbit noticed a reddish brown stain that appeared to be blood on Fritts's pants. Agent Corbit stated that Fritts's clothes, shoes, and hat were collected at the completion of the interview. Following the interviews, Agent Corbit returned to the victim's house to look for the murder weapon, which he believed to be the hatchet that Mr. Busler kept under his mattress, and any additional evidence. Shortly thereafter, he and other officers found what appeared to be blood on the washing machine and towels inside and some white, hard objects that appeared to be bone.

Agent Corbit stated that the knife with the bent tip that Mr. Busler kept under his bed and the five pocket knives belonging to Mr. Busler that were collected did not have any evidentiary value and were not consistent with the murder weapon in this case. He said he was called to the crime scene on March 13, 2007, after the hatchet was found and that he and Detective James collected the hatchet and its sheath from the attic above the garage. On April 18, 2007, Agent Corbit discovered the spray can of Kilz primer and collected it as evidence. On the same date, he collected a Sponge Bob notebook that Mr. Busler had found. Agent Corbit read several of the entries in this notebook, which mentioned killing females with a hatchet and biting them, decapitation, and suburban serial killers. He acknowledged that the notebook contained the handwriting of several individuals and that he had not determined whether the entries he had read to the jury had been written by Fritts. He also acknowledged that he had not submitted the notebook to a handwriting expert and admitted that he could have gotten a search warrant for a handwriting sample from Fritts. Agent Corbit also stated that oral swabs were taken from Fritts and Mr. Busler during the investigation.

Joseph Pinkerton, a child protective services investigator for the Department of Children's Services (DCS), testified that on March 6, 2007, he received a referral for Dawn Stutler's child, B. Pinkerton explained that B. had no custodian because one of her custodians had been murdered and the other custodian, Mr. Busler, was a suspect.

\*      \*      \*

7

Once law enforcement informed Pinkerton that Mr. Busler was not a suspect, Pinkerton allowed Mr. Busler to take custody of B. Pinkerton interviewed Dawn Stutler a few days later and with her assistance, tried to contact Fritts. When he met with Fritts a few weeks later, he asked him about the victim's murder.

Fritts told Pinkerton that on the day of the victim's murder, Mr. Busler came by his room and asked him if he needed a ride to work. Fritts told Mr. Busler that he did not have to work that day and did not need a ride. Later, Fritts said his work called to tell him that he did need to come into work, and Fritts began walking to work because he did not have a car. He told Pinkerton that he believed that the victim was asleep when he went to work and that he left the child with her. Fritts said that after he left the house, he changed his mind and decided not to go into work. Fritts said that work called him around 10:00 a.m. and that he left the house around 10:45 a.m. He said he eventually went to the West Town Mall in Knoxville before he was contacted by law enforcement around 5:45 to 6:00 p.m. He stated that B. was still in her room when he left the morning of March 6, 2007, and that Dawn Stutler, his wife, was not at the victim's home because she had spent the prior night at a friend's house. He stated that he never saw the victim that morning and believed she was asleep in her bedroom.

Agent Corbit was called a second time by the State to testify about his interview with Fritts that took place on March 6, 2007, between 7:00 and 8:00 p.m. He stated that Fritts was not in custody at the time and had agreed to voluntarily speak to the police. Fritts told Agent Corbit that he had been asleep the morning of March 6, 2007, before receiving a message at 10:15 to 10:30 a.m. from Matt, his manager at Arby's, asking him to come into work that day. Fritts said he got up and put on a red sweatshirt and blue jeans. When he left the house at 10:45 a.m., he accidentally forgot to lock the door. He began walking to work, but once he got to the Shell Station near the interstate in Clinton, he chose not to go to work. Fritts told Agent Corbit that when he left the house that morning, both B. and the victim were asleep in their bedrooms. He said he did not hear any noises coming from the victim's bedroom and that her bedroom door was closed when he left. Fritts said that Dawn had spent the night of March 5, 2007, with a friend. He said he was at the West Town Mall when law enforcement first called him to let him know that something had happened to his mother-in-law. After that, he called his mother to pick him up and take him to the sheriff's department in Clinton. After he talked to law enforcement, Dawn Stutler called to tell him that the victim was dead.

At the request of defense counsel, Agent Corbit read Fritts's March 6, 2007 statement in its entirety to the jury:

On 03/06/07, I Robert Edward Fritts, provided TBI Special Agent Andy Corbit with a written statement. I was explained that this was a voluntary statement and I was free to stop speaking at any time. I am married to Dawn [Stutler] and we live with her parents at 128 Big Valley Road in Andersonville. My mother in law is Teresa Busler and my father in law is John Busler, but I call him Steve. My wife Dawn has a two[-]year[-]old daughter named [B.]. I have been married to Dawn since January 2nd, 2007 and she is pregnant with our child that is due in April 2007. The Busler[]s have legal custody of [B.]. I have lived at 128 Big Valley Road since around October 31, 2007.... There are four adults and one child that live in the home. I work at Arby's restaurant by the interstate in Clinton. I work first shift and usually go in at 8:30AM and work until 5:00PM. I usually ride to work with Steve and he drops me off at Arby's each day around 6:30AM on his way to work in Knoxville. I was scheduled off today and a manager, possibly Matt, called at about 10:00AM on my cell phone, 384–6228. Matt left a message calling me into work. I heard the message around 10:15AM to 10:30AM. I got read[y]. "Did not shower." I put on my clothes which were a red hoodie, sweat shirt, blue jeans, tennis shoes, and a black t-shirt.... My car is broke [sic] down. "Subaru." So I had to walk to work from my house on Big Valley Road. When I left my house I accidentally forgot to lock the front door. I continued walking toward the interstate and by the time I got to the Shell station by the interstate, I decided not to go to work because I did not feel like it. It usually takes me one to two hours to walk from Big Valley Road to my work at Arby's.... I walked down the [two-]lane [road] I have walked to work four or five times in the past. I left the house on Big Valley Road at 10:45AM this morning and I have not been back since then. When I left [B.] was asleep in her room and Teresa was asleep "assume" in her room. I did not hear any noise and both doors were closed. I woke up around 10:00AM this morning, and I used the bathroom and ate some cereal while I watched TV in the living room. My wife Dawn was at ... a friend's house in Medford by the name of Martha and Sabrina. Dawn was visiting them and Martha was hospitalized last night and she helped Sabrina take care of her baby. Dawn and I have not had any recent arguments. Dawn did not stay at home last night because she stayed with Sabrina. She went to Sabrina's house around 2PM yesterday. I did not talk to [B.] or Teresa this morning. I slept in the bedroom with [B.] last night.

I recall Steve asking if I needed to ride to work this morning but I said no. I went back to sleep until 10AM.... I get along with Steve and Teresa and there have not been any recent arguments with Steve and Teresa ... [Teresa was] alive ... last night when she came home from work "Cracker Barrel, Lake City." Teresa was picked up by Steve last night and came home around 11:30PM or midnight. Teresa came in and did some dishes and laundry last night. I went to bed around 12:30AM. [B.] was already asleep and she went to bed around 11:45PM. I don't recall what time Steve and Teresa went to sleep. I did not notice them arguing and their moods appeared okay. Teresa usually gets up around 1[:00] to 2:00PM but there is no set time. Teresa will usually stay in bed until after lunch. Steve is usually up in the morning around 5:30AM to 5:45AM. I am normally [up] when I work at about 5:30AM. Teresa usually leaves for work at around 5:30PM and Steve takes her to work each day. Steve gets home each day around 5PM from work.... Steve drives the tan Lincoln and I have a Subaru that is broke [sic] down. When I got to the area near my work today I used my cell phone to get a ride but I was unsuccessful. I met up with a stranger named Doug by the entrance ramp "south side I–75." At around 4PM I went to Git'n'Go to buy a Code Red Mountain Dew. I said hello to a friend named Charity that works there. I then walked to the southbound on ramp. I recall Doug being a white male heavy set late 30s to early 40s with long red hair and a red beard. Doug was wearing a tan shirt and greenish colored jogging pants. Doug was driving a gray station wagon and he picked me up around 4:15PM. Doug pulled over and asked if I needed a ride. I asked Doug to take me to West Town[ ] Mall. We traveled down I–75 to I–40 west to the West Hills exit. I did not compensate Doug in any way for the ride.... Doug let me out at the West Hills exit near Kingston Pike. Doug talked about God and said that God was watching over me. I walked over to West Town [ ] Mall and went in through Dillard[']s to the bathroom in the food court. I spoke to Katie from fifteen to twenty minutes who was a friend that worked at Taco Bell in the food court. I also went to the stores Hot Topic, Spencer[']s, and Game Stop. While I was at the mall I received a call from Bill Breeding and I was informed that something had happened to my mother[-]in[-]law. I don't recall the time but it was starting to get dark. I called my mother Rebecca Fritts to pick me up and I was picked up at the mall near JC Penn[e]y. I exited the mall through

the parking garage. When my mom picked me up we came straight to Clinton to the sheriff's department.... When I was in Clinton earlier today walking around at the Clinton exit, I walked past my work location, I walked past the high school around the SunTrust bank area. When I left the house this morning the front door was completely shut and both doors to [B.]'s and Teresa's rooms were shut. I did not hear any sounds today at the house that would indicate a fight or a struggle. I do not have a key to the house and I usually lock the bottom lock when I leave. I called my manager, Steve, ... and [h]e said I did not have to work today. My wife thought I was working today. I spoke to Sabrina today to get in touch with my wife after I learned something happened to my mother[-]in[-] law. Dawn called me from 128 Big Valley Road and told me Teresa was dead. I did not ask Sabrina if Teresa was dead or still alive prior to finding out this information from Dawn "wife".... I do not have a clue who did this to Teresa and I have nothing to hide. I did not have anything to do with the death of Teresa.

Agent Corbit talked to Fritts again on March 8, 2007, after Fritts was informed of his *Miranda* rights. In his second written statement, Fritts admitted that he had been dishonest with Agent Corbit when he said he had been called into work on March 6, 2007; however, he insisted that he had not hurt the victim and was not there when she was killed. When Fritts gave this second statement, Agent Corbit concluded that Fritts had lied to him about what he claimed had happened the day of the victim's death.

Matthew Brian Sergent, Fritt[s]'s manager at Arby's, testified that Fritts was not scheduled to work at the Arby's in Clinton on March 6, 2007. He stated that he never called Fritts to work and never left a message for him to work on March 6, 2007. In addition, he stated that he was not aware of any other managers calling Fritts that day. He said Fritts did not work at all the week of March 5–11, 2007.

Juanita Cox, the assistant manager at Arby's in Clinton, testified that Fritts was not scheduled to work on March 6, 2007. She also testified that she did not call Fritts into work on March 6, 2007 and did not know of anyone else that called him into work that day.

Jill Longmeyer, who knew Dawn Stutler when she was in elementary school, testified that she and her husband owned a school bus line. She said she saw Stutler five days a week during the school year when she was driving one of the school buses. Longmeyer said that she had seen Stutler and Fritts pass by their house three

11

or four times. On two or three occasions, which occurred within six months of the victim's death, Stutler was yelling at Fritts to stop, and Fritts told her to shut up. Longmeyer noted that it was rare to see anyone walking in the area near her house because there were no sidewalks. On March 6, 2007, at 4:00 p.m., Longmeyer saw Fritts walking to the left of her home. She recalled that Fritts was wearing a bright red sweatshirt and dark pants at the time. She stated that the Busler[] residence was only a short distance away from her home.

Charles Douglas Powell testified that on March 6, 2007, he lived at 205 Big Valley Road in Andersonville, which was approximately one hundred yards away from the victim's home. On March 6, 2007, Powell went home for lunch and saw a man wearing a bright red sweatshirt with the hoodie pulled up and jeans walking westbound down Longmeyer Road in front of Longmeyer's deli at 4:02 or 4:03 p.m.

Charity Thompson, who worked at the Git'n'Go convenience store in Clinton at the interstate, testified that she saw Fritts inside the store between 4:00 and 4:15 p.m on March 6, 2007. She saw him exit the store and walk down the road toward the interstate. She stated that he was wearing a red hoodie, a black hat, dark blue jeans, and black shoes at the time.

Katherine Hancock, who worked at the Taco Bell at the food court in West Town Mall, testified that Fritts was a friend from the mall and that they were part of a group of friends who spent a significant amount of time at the mall. She stated that she saw Fritts on March 6, 2007, between 5:00 and 6:00 p.m. while she was working at Taco Bell and talked to him for about five minutes. She said that Fritts was walking around the mall looking for friends. Hancock recalled that Fritts was wearing a red sweatshirt he often wore that had the name of the Insane Clown Posse band on it as well as a picture of "the Wraith," which is a devil with red horns and a red cape. She also remembered Fritts wearing a black baseball cap that day.

Jamie Woodward, a lead officer in security at West Town Mall, testified that Fritts was friends with a group of teenagers who frequented the West Town Mall, wore alternative clothing, and were known as "mall rats." Woodward stated that he saw Fritts in the food court area of the mall on March 6, 2007, or March 7, 2007, and that Fritts was wearing dark pants, a red sweat shirt, and a ball cap. He also saw Fritts at the mall on March 10, 2007, and on that date Fritts told him that his mother-in-law had been killed and that the police believed that he was responsible. Fritts said that the last time he had seen his mother-in-law was at 10:45 a.m. on March 6, 2007.

12

Robin Ward, the victim's co-worker at Cracker Barrel, testified that she had a conversation with the victim on March 5, 2007. During that conversation, the victim stated that Fritts made her feel very uncomfortable and that she was afraid of him.

Dawn Stutler testified that she and Fritts were married on January 2, 2007. She stated that she met Fritts at the West Town Mall and that they were "mall rats." Stutler stated that Teresa Busler, the victim, was her mother and that she and Fritts lived with her mother and stepfather, John Busler []. She stated that she had spent the night of March 5, 2007, with her friends Sabrina Hawkins and Martha Wilson and that they had all gone to the Wal–Mart hair salon in Oak Ridge on March 6, 2007. That day, she signed into the Wal–Mart hair salon at 11:29 a.m. and had stayed at the salon until 4:00 p.m. She said she was at Sabrina's house when Fritts called her around 5:00 p.m. and told her something had happened to her mother and that the sheriff was going to call her. During that conversation, Stutler said that she was angry at Fritts because he had not answered his phone when she had tried to call him while at the hair salon. She was unhappy with Fritts because he was supposed to be at home watching B. that day. Fritts told her that something bad had happened, and he seemed upset because no one would tell him what had happened. During her call with Fritts, an officer called her and asked her to come home. . . . She said her friend Sabrina Hawkins drove her home and during the drive, she talked to Fritts, who was upset because no one would tell him what had happened. When she arrived home, her stepfather John Busler told her that her mother was dead.

Stutler stated that Fritts had a tattoo of a hatchet man, which is a symbol associated with the Insane Clown Posse band or ICP, and that she later got the same tattoo. She said Fritts wore ICP clothes, which depicted faces or the hatchet man logo, and he had a silver necklace with the hatchet man on it. In addition, she said Fritts wore non-prescription, white colored contact lenses that made his eyes look like they were all white.

Stutler stated that the Sponge Bob notebook her stepfather found belonged to Fritts and that Fritts had this notebook when they met. She said that she did not believe the first five pages of the notebook were in Fritts's handwriting, even though she admitted previously telling the prosecutor that these pages were in Fritts's handwriting. She acknowledged that the last of the five pages of the notebook titled "Prep School Murders" could have been in Fritts's handwriting. She also acknowledged that she changed her mind about whether Fritts's handwriting was on these first few pages of the notebook after meeting with Fritts's attorney. Stutler admitted that she had shown Fritts the location of the knife under her stepfather's

13

side of the mattress. She also admitted that the hatchet was in the same location as the knife.

Stutler said she and Fritts often walked places from their home on Big Valley Road. She said they often argued and one time, she threw rocks at him. She acknowledged telling law enforcement officers that some of the lyrics in Fritts's notebook were "very messed up" because they discussed killing people. She told the officers that the lyrics "creeped [her] out" but did not recall telling the officers that Fritts wrote the lyrics in the notebook. Stutler said that Fritts listened to ICP music and owned some ICP clothing; however, she said that Fritts was not obsessed with ICP.

Troy Williams testified that in July 2007 he was incarcerated with Fritts in the Anderson County Detention Facility. He said that he and the other inmates called Fritts "Hatchet man" because of Fritts's tattoo and because of the crime he had committed. Williams said that Fritts told him about his murder charge and told him that he did not get along well with his mother-in-law because she thought that he was not helping Stutler, was not contributing financially, and was not a responsible person. Fritts also told Williams that the police had found the murder weapon in an attic and had found blood on his clothing and blood stains on his shoes and pants.

Dustin Dalton testified that in 2008 he shared a cell with Fritts for two months while incarcerated in the Anderson County Detention Facility. He said Fritts showed him lyrics he had written, which sounded like the band ICP, that talked about "hacking your brains out and I'll cut your f—ing head off" and "I'll split your wig open[.]" Dalton said that when he asked Fritts why he killed the victim, Fritts replied, "I just snapped. And when I came to, she was dead." Fritts said that he was wearing his uniform from either Arby's or Wendy's at the time.

Although the defense stipulated during a jury-out hearing that Thomas Walker, a detective with the Gang Unit of the Knox County Sheriff's Department, was "qualified as an expert on gangs," his testimony during that hearing is relevant to the admission of gang-related evidence in this case. Detective Walker testified that the Insane Clown Posse or ICP, was "a rap band or horror core band" and the ICP gang was an offshoot of the musical group. ICP gang members referred to themselves as "jug[g]alos" or "jug[g]alettes" and did not believe in abiding by society's laws. They did not work, did not bathe, and rebelled against everything. He explained the belief system of an ICP gang member:

> Basically, they just want to listen to music, you know, play video games, write their own lyrics to their songs. They have to live the life of a good jug[g]alo in order to pass the six trials and tribulations of the dark carnival, which are the six clowns that are featured on

14

the six albums.  Each album has its own meaning.  You have to listen
to it and figure out what your hidden meaning is for each album, in
order that when you die your spirit is drug into the dark carnival and
then you must pass the six trials and tribulations to make your way
into Shangra–La[] or hell's pit depending on your belief system [].

....

Okay.  Basically once you pass your six trials and tribulations, if the
clowns believe you've lived the life of a good jug[g]alo, then you
will go to Shangra–La[].  They don't believe that at any given time
during the six trials and tribulations then you will go to hell's pit.
How you live the life of a good jug[g]alo depends on the individual
philosophy of the individual listening to it.

You can take the songs of ICP literally which say, you know, you're
supposed to kill people or you're supposed to dismember or
whatever or you just don't follow society's rules.  You don't want
to get a job.  You live off of whatever you can.  You know, it's just
not following society's rules and laws.

Detective Walker stated that the "Wraith", one of the clowns in the ICP belief
system, had two horns, wore a red outfit, and had a raven on his shoulder.  He stated
that Fritts was wearing a shirt bearing a picture of the Wraith on the day of the
victim's death, which was collected by the police.  Detective Walker stated that
Fritts had a tattoo which stated, "a jug[g]alo for life" on his arm and another tattoo
on his forearm of the running hatchet man, which is the logo for Psychopathic
Records that produces the Insane Clown Posse music.

Detective Walker provided a copy of Fritts's notebook for the trial court to review.
He stated that ICP members often write their own lyrics, and he found these
types of lyrics in Fritts's notebook.  In addition, Detective Walker relied on information
from an inmate about Fritts writing lyrics that spoke about hacking brains out and
splitting brains open to categorize Fritts as an ICP gang member.  He stated that
Fritts's lyrics were related to the ICP gang because several ICP songs referenced
decapitation, mutilation, and dismemberment.  He stated that the term "splitting
wigs" meant to "split your head, where your wig would be" and was a common
term used by the ICP gang.

At the conclusion of the jury-out hearing, the trial court ultimately found that
Detective Walker could testify and form an opinion "as to the identification and
classification of gangs and gang members."

At trial, Detective Walker testified consistently with the above testimony and further opined that Fritts was a member of the ICP gang based on Fritts's sweatshirt depicting "Wraith", the lyrics in his notebook, his tattoos of the "Running Hatchet Man" and "Jug[g]alo for Life," which were displayed to the jury, and the fact that he spent a substantial amount of time at the West Town Mall.

Richard Parker, a lieutenant with the Anderson County Sheriff's Department, testified that he monitored and supervised the booking office and staff at the Anderson County Jail. On September 25, 2009, Lieutenant Parker told Officer Michael Finney to confiscate Fritts's white shoes because they had graffiti written on them. He stated that Fritts had purchased shoes through the commissary at the jail and that the jail considered any writing or drawings on the shoes to be contraband. Lieutenant Parker examined the graffiti on the shoes, which stated, "M.C. Axe." He explained that gang language on objects can cause a security threat because gang members who are incarcerated are constantly competing for power.

Agent Corbit was called by the State a third time and testified that during Fritts's interview at the sheriff's department the day of the victim's death, he noticed a reddish brown substance on Fritts's pants. At the conclusion of the interview, he asked to collect Fritts's pants and asked him about the stain on his pants. Fritts stated that the stain occurred when he had a nose bleed a week prior to the date of the interview.

Paulette Sutton was declared an expert in the field of blood stain pattern analysis. She testified that the victim suffered at least ten blows with a hatchet-like weapon.

Dr. Murray Marks, an employee of the University of Tennessee Medical School, was declared an expert in the field of forensic anthropology. He stated that he received three packages from Agent Corbit for his examination. Dr. Marks stated that the contents of two of the packages were pieces of bone from a human skull. He stated that although the contents of the third package appeared to be bone, the item was too small for him to determine whether it was human bone.

Hoyt Phillips, a Special Agent Forensic Scientist with the TBI, was declared an expert in the field of latent fingerprints. Agent Phillips stated that although he was able to identify several latent fingerprints collected from the scene, he was unable to determine to whom these prints belonged. He said he examined the hatchet and its sheath that were found in the attic above the garage, but he was unable to find the presence of any latent fingerprints. In addition, he tested the spray can of primer and determined that the latent prints on the can did not match the known fingerprints of Fritts.

16

Randall Kirk Nelson, a Special Agent Forensic Scientist in the micro analysis unit of the TBI laboratory, was declared an expert in the field of microanalysis of paint and glass. He testified that he examined Fritts's clothing, an Arby's shirt from a hallway closet in the victim's home, a can of paint from the bathroom, the victim's clothing, two swabs from the victim's face, a spray can of Kilz Primer Sealer, and a sheet from the victim's [bedroom]. He stated that he did not find any paint on Fritts's jeans, left shoe, and sweatshirt. He stated that he did not analyze the paint can from the bathroom because the paint on the Arby's shirt and the victim's clothing appeared to be spray paint and the paint from the bathroom was a liquid can of paint.

When Agent Nelson analyzed the Arby's shirt, the victim's sweatshirt, the swabs from the victim's face, and the sheet from the bedroom, he determined that all of these items had paint on them that was consistent in color, binder composition, and pigment composition. He stated that the paint from these items could have come from the same source or different sources with the same binder and pigment composition. However, Agent Nelson stated that the paint in the Kilz spray can was not consistent with the paint on the Arby's shirt, the victim's sweatshirt, the swabs from the victim's face, or the sheet from the bedroom. He then determined that the paint in the paint can was inconsistent with those pieces of evidence.

Linda Littlejohn, a Special Agent Forensic Scientist, was declared an expert in the field of microanalysis with a specialization in shoe print analysis and comparisons. Agent Littlejohn determined that the size, shape, and tread design from Fritts's right shoe, which was found in the victim's living room, was consistent with a partial shoe print from blood in the victim's kitchen. With a different print, she was unable to do a physical comparison but conducted a visual comparison and concluded that Fritts's shoe and the partial print had the same tread design and appeared to be similar. Agent Littlejohn stated that she was not aware that cats were running through the crime scene as evidence was being collected. She stated that although it was not ideal for pets to be running through the scene, it did not affect her evidence as much as it might have affected someone else's evidence.

Chad Johnson, a Special Agent Forensic Scientist with the TBI, was declared an expert in the field of serology and DNA analysis. Agent Johnson stated that he examined Fritts's jeans and visually determined that there was a reddish brown stain that appeared to be blood in several places on the jeans. He then conducted a test, which was positive that these areas were presumptive blood. He then compared the blood on Fritts's jeans to the known standard from the victim and concluded that the blood on Fritts's jeans belonged to the victim. In addition, he concluded that the blood from Fritts's right shoe belonged to the victim. Agent Johnson also concluded that the blood from one of Fritts's shoes found in the living

17

room was consistent with that of the victim. When he tested the hatchet, he determined that a partial profile existed that was consistent with the victim's blood.

The Defendant–Appellant's mother, Rebecca Fritts, testified that she picked up Fritts on March 6, 2007, at the West Town Mall after the police contacted him. She stated that Fritts had called her earlier in the day for some phone numbers of friends to take him to the mall and that he exhibited his normal demeanor during that conversation. During their second conversation, Fritts notified her that he had gotten a call from the sheriff's department and "was a little bit upset after that." She stated that she picked up her son from the mall, and when her son discovered that his mother-in-law was dead, he became "very upset." She testified that pages one, two, three, four, five, six, and seven of the notebook were not in Fritts's handwriting. She acknowledged that Fritts's handwriting was on page eight of the notebook and that Fritts's and Dawn Stutler's handwriting was throughout the rest of the notebook.

Fritts declined to testify.

*Fritts I*, at *1–14. Based on this evidence, the jury found Petitioner guilty of first-degree murder [Doc. 13-1 p. 121]. Petitioner appealed this conviction to the TCCA, which affirmed it, and the Tennessee Supreme Court denied review. *See generally id.*

Petitioner next filed a pro se petition for state post-conviction relief [Doc. 13-21 p. 4–9]. Then, through counsel, Petitioner filed an amended petition asserting ineffective assistance of counsel claims, a due process claim, and a cumulative error claim [*Id.* at 30–45]. The post-conviction court held an evidentiary hearing, which the TCCA summarized as follows:

The post-conviction court held a lengthy hearing on the petition for relief. At the hearing, trial counsel testified that he was appointed to represent Petitioner at trial. Trial counsel was licensed to practice law in 1994 and devoted 95 percent of his practice to criminal defense. At the time of the post-conviction hearing, trial counsel was death penalty certified and had handled over twenty-five murder trials.

Trial counsel filed several motions prior to trial, including a motion to exclude photographs. Trial counsel recalled the introduction of several pictures of the victim's body in which "brain matter" was clearly visible. Trial counsel explained that in a typical case, there would be a "conference prior to trial to address the issues of the photographs." In fact, trial counsel thought that there was a hearing prior to trial in Petitioner's case as well as a conference at the bench during trial with regard to several sets of photographs, though he "d[id] not have an independent

18

recollection" about the specifics at the time of the hearing. Trial counsel maintained that the defense strategy was that Petitioner "did not commit this offense." Trial counsel went on to explain that this trial strategy led to "no white-washing the fact that this victim was brutally murdered."

Trial counsel "vaguely" recalled the introduction of the 9–1–1 tape into evidence. On cross-examination, trial counsel recalled that the 9–1–1 tape was actually beneficial to the defense because Mr. Busler was "frantic" during the beginning of the tape and "calm" toward the end of the tape. According to trial counsel, the 9–1–1 tape helped to make Mr. Busler look suspicious. Trial counsel admitted that the crime scene videos were introduced into evidence. Trial counsel reiterated that Petitioner "was insistent on his defense that he was not the culprit or did not murder this particular woman in this particular case." Trial counsel also explained that in his opinion the videos showed that "the TBI did such a sloppy job ... that there was maybe some hope of casting doubt on some aspects of the validity of their investigation." Trial counsel went on to explain that the video showed that there were a "number of cats ... crawling all over the body during the course of their investigation" and "spatters of blood either from the actual crime ... or from the cats walking on top of the victim."

Trial counsel remembered that a number of jail house "snitches" were subpoenaed to testify against Petitioner at trial. However, he did not "have an independent recollection" of the specifics of the testimony of those witnesses, specifically Dustin Dalton's testimony. Trial counsel explained that the record would show that he attempted to attack Mr. Dalton's credibility by impeachment.

Trial counsel did not recall the testimony of Robin Ward, a coworker of the victim who testified that the victim was afraid of Petitioner. Trial counsel recalled the introduction of a journal into evidence at trial and how it indicated Petitioner's interest in the Insane Clown Posse as well as notes that appeared to be written back and forth between Petitioner and his wife. Trial counsel explained that he "did a lot of research" on the band. Trial counsel explained that the lyrics to their songs were "graphic" and that the journal contained song lyrics from actual songs as well as lyrics that Petitioner appeared to have "drafted himself along the line of the themes portrayed in [I]nsane [C]lown [P]osse songs in this notebook." Trial counsel maintained that the journal and Petitioner's "involvement as it relate[d] to the [I]nsane [C]lown [P]osse ... had nothing to do with the killing of [the victim]." With regard to the journal, trial counsel could not recall which witnesses attributed which pages of the journal to Petitioner. Trial counsel admitted that he did not object to Special Agent Andy Corbitt reading portions of the journal into evidence and was unable to articulate a reason for which he could have objected at trial.

Trial counsel admitted that he did not object to the introduction of the photograph of the victim while she was alive, noting that it was typical for courts to allow this type of photograph in order to "give some historical perspective to the jury." Trial counsel did not have a valid reason to object to the testimony.

19

Trial counsel admitted that he did not object during the prosecutor's closing argument but explained that he was familiar with the prosecutor involved in the case and her penchant for drama. Trial counsel explained that it was customary for him to "advise juries [during closing argument] that [he] should have taken more drama classes when [he] was in college" and that the arguments of the lawyers were not evidence.

Trial counsel maintained that the trial strategy employed during the entirety of the trial was that Petitioner did not commit the crime. In fact, Petitioner insisted that he was not responsible for the victim's death and was not there when the victim died. Therefore, trial counsel explained that testimony from Terry Labor, a crime scene expert, explaining that he could not determine the length of time the victim was on the bed prior to getting to her final resting position was irrelevant because Petitioner maintained that he did not commit the crime.

Trial counsel recalled testimony at the trial about the back door to the residence being propped or forced open about one week after the murder. Trial counsel testified that he did not "think that issue was relevant" to the defense and therefore did not pursue who was suspected of breaking into the house.

Trial counsel explained that he contemplated other defense strategies at trial, including pursuing a second degree murder conviction. However, trial counsel explained that in order to pursue a second degree murder conviction Petitioner would have to acknowledge that he was the perpetrator and "he was never willing to do that." Trial counsel mentioned second degree murder in his closing argument in order to give the jury something "to hang their hat on if, in fact, they believed [Petitioner] was the culprit."

Trial counsel testified that Rhonda Lakin was the mitigation expert hired by trial counsel to investigate sentencing. Trial counsel reviewed school psychological evaluations prior to trial. Trial counsel also arranged for Petitioner to be evaluated by a forensic psychologist prior to trial. Trial counsel chose not to utilize testimony from any of the mental health professionals at trial because Petitioner's own mother gave "testimony ... about his disabilities and issues related to that" and trial counsel doubted that mitigation testimony "would have been well received by the jury."

Trial counsel did not believe that he did anything at trial that would support a claim of ineffective assistance of counsel. Trial counsel recalled his frustration with the fact that Petitioner would not "pursue this case as a second degree murder" case.

Petitioner testified at the hearing. Petitioner explained that he met with trial counsel's investigator on two occasions. Petitioner denied writing any of the lyrics in the journal that was introduced at trial. Petitioner admitted that he wrote in the journal, claiming that the only items in his handwriting were the letters between him and his wife. Petitioner maintained that he informed trial counsel several times

that he did not write the lyrics. Petitioner admitted that trial counsel got at least two witnesses, his wife and his mother, to testify that it was not his handwriting in the journal. Petitioner denied drawing the upside down cross appearing in the journal and denied being a Satanist. Petitioner complained that trial counsel only called one witness at trial. Petitioner admitted that he told trial counsel he did not want to argue second degree murder at trial because he denied any involvement with the murder but now complained that trial counsel did not pursue a theory of second degree murder.

At the conclusion of the hearing on the petition for post-conviction relief, the post-conviction court commented that the case was "well" remembered by the court because the facts were "candidly the worst of any murder case [the court] had ever been involved in, either as an attorney, an observer in the crowd, or a judge." The post-conviction court was perplexed as to why the State did not seek the death penalty. The post-conviction court noted trial counsel's qualifications to represent Petitioner and trial counsel's use of professionals hired through the Administrative Office of the Courts. With regard to the individual issues raised in the "most complete post-conviction petition" that the court had ever ruled on, the post-conviction court commented on each issue in turn, ultimately concluding that Petitioner was not entitled to relief. The post-conviction court specifically commented that trial counsel "did all he could do with what he had" and that there was "no evidence" presented at the hearing of deficient performance. Trial counsel "hired and consulted with experts ... hired and consulted with a private investigator ... examined those witnesses on appropriate points ... objected at appropriate times ... filed appropriate motions ... [and] did everything he could do."

*Fritts II*, at *2–4. The post-conviction court overruled and dismissed the petition [*Id.* at 53–54; Doc. 42], the TCCA affirmed, and the Tennessee Supreme Court denied review. *See generally id*.

Petitioner then filed the instant § 2254 petition asserting that: (1) the court's admission of evidence of his gang affiliation was error; (2) the evidence was insufficient to support his conviction; (3) claims for ineffective assistance of trial and post-conviction counsel; (5) a claim that the trial court denied him due process in his post-conviction hearing; and (6) a cumulative error claim [Doc. 1 p. 6–11, 16–19].

## II.    STANDARD OF REVIEW

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which allows a federal court to grant habeas corpus relief

on any claim adjudicated on the merits in a state court only where that adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established" United States Supreme Court precedent; or (2) "resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented." *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

This Court may grant habeas corpus relief under the "contrary to" clause where the state court (1) "arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law; or (2) decide[d] a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405 (2000). The Court may grant habeas corpus relief under the "unreasonable application" clause where the state court applied the correct legal principle to the facts in an unreasonable manner. *Id.* at 407.

But even an incorrect state court decision is not necessarily unreasonable. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold") (citing *Williams*, 529 U.S. at 410). Rather, this Court may grant relief for a claim decided on its merits in state court only where the petitioner demonstrates that the state court ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

## III. ANALYSIS

### A. Evidence of Gang Affiliation

In his petition, Petitioner first claims that the state court's admission of evidence of his gang affiliation was error [Doc. 1 p. 6]. In his response to the petition, Respondent contends that this claim is not cognizable in this action, as Petitioner exhausted it with the TCCA based only on

an alleged violation of state law and does not allege a violation of his constitutional rights based on the admission of this evidence in his petition [Doc. 15 p. 16]. In his reply, Petitioner states that this claim "is closely related to" his claim challenging the sufficiency of the evidence to support his conviction, and that he intended these two claims as one claim [Doc. 22 p. 7–8]. Accordingly, the Court will address this argument with Petitioner's claim challenging the sufficiency of the evidence to support his first-degree murder conviction.

But to the extent that the § 2254 petition and reply can be liberally construed to bring the same claim that Petitioner raised in his direct appeal to the TCCA, which is that the admission of the gang expert evidence violated state law [Doc. 13-34 p. 5, 15–16], that claim is not cognizable in this action. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law . . . binds a federal court sitting in habeas corpus").

### B. Sufficiency of the Evidence

Petitioner next claims that the evidence was insufficient to support his first-degree murder conviction [Doc. 1 p. 7; Doc. 22 p. 8]. In its opinion affirming this conviction, the TCCA described the elements of first-degree murder and the required premeditation for such a conviction under Tennessee law as follows:

> First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39–13–202(a)(1) (2006). Premeditation is defined as "an act done after the exercise of reflection and judgment." *Id.* § 39–13–202(d). This section further defines premeditation:
>
>> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

23

*Id.* "'Premeditation' is the process of thinking about a proposed killing before engaging in the homicidal conduct." *State v. Brown,* 836 S.W.2d 530, 540–41 (Tenn. 1992) (quoting C. Torcia, *Wharton's Criminal Law* § 140 (14th ed.1979)).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. *State v. Rosa,* 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing *Brown,* 836 S.W.2d at 539). ["Several circumstances that may warrant the trier of fact to find or infer premeditation"] include "[t]he use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after a killing." *State v. Davidson,* 121 S.W.3d 600, 614 (Tenn. 2003) (citing *Bland,* 958 S.W.2d at 660; *State v.* [*Pike*], 978 S.W.2d 904, 914–15 (Tenn. 1998)). This Court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. *State v. Bordis,* 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted). In addition, a jury may infer premeditation from a lack of provocation by the victim and the defendant's failure to render aid to the victim. *State v. Lewis,* 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

*Fritts I,* at *17–18.

The United States Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307 (1979), provides the controlling rule for Petitioner's claim challenging the sufficiency of the evidence to support his first-degree murder conviction. *See Gall v. Parker*, 231 F.3d 265, 287–88 (6th Cir. 2000), *superseded on other grounds Parker v. Matthews*, 567 U.S. 37 (2012). In *Jackson*, the Supreme Court held that the evidence is sufficient to sustain a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. In making this determination, the district court may not "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

A federal habeas court reviewing the sufficiency of the evidence must apply two levels of deference. *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007). First, under *Jackson*, this Court gives deference to the verdict "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (citing *Jackson*, 443 U.S. at 324 n.16); *see also Cavazos v. Smith*, 565 U.S. 1, 6–7 (2011) (providing that "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution'") (quoting *Jackson*, 443 U.S. at 326). This Court must give additional deference to the state court's consideration of the verdict under the AEDPA's highly deferential standards. *Cavazos*, 565 U.S. at 6 (noting the double deference owed "to state court decisions required by § 2254(d)" and "to the state court's already deferential review"). As such, a petitioner challenging the evidence against him "bears a heavy burden." *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986).

In addressing Petitioner's claim challenging the sufficiency of the evidence to support his first-degree murder conviction in his direct appeal, the TCCA cited *Jackson v. Virginia*, 443 U.S. 307 (1979) and various state court cases before analyzing this claim as follows:

> Viewed in the light most favorable to the State, we conclude that a rational juror could infer Fritts's identity as the perpetrator in this case based on the evidence presented at trial. The proof established that the victim was killed when she was struck with a hatchet more than ten times. Dawn Stutler acknowledged that, prior to the victim's death, she had shown Fritts the location of her stepfather's knife under the mattress and that the hatchet was in the same location as the knife. Significantly, Fritts admitted that he was the last person to see the victim alive. Although Fritts denied hearing a struggle inside the house and denied seeing a blood trail in the house to Agent Corbit, the victim's blood was found on Fritts's pants and shoe. In addition, Agent Littlejohn testified that a partial shoe print in blood at the scene was consistent with the size, shape, and tread design from Fritts's right shoe[.] Moreover, Agent Nelson testified that the white paint that had been sprayed on the victim's face and hand as well as the paint found on her sheet and sweatshirt was consistent with the paint on Fritts's Arby's shirt found in the closet of the home.

25

Jill Longmeyer and Charles Powell testified that they saw Fritts a short distance away from the victim's home approximately an hour before the victim's husband returned home to find the victim's deceased body. Dalton Jones, who was housed in the same cell with Fritts following the offense, testified that when he asked Fritts why he had killed the victim, Fritts replied, "I just snapped. And when I came to, she was dead." Furthermore, Fritts's affiliation with the ICP gang also assisted the jury in identifying him as the perpetrator in this case. Fritts had a tattoo of the running hatchet man, a common tattoo worn by ICP gang members, and the lyrics in Fritts's notebook mentioned mutilation, de[capitation], and biting female victims. The evidence presented at trial established that the victim was killed with a hatchet and that her assailant left bite marks. Moreover, evidence was presented that followers of the Insane Clown Posse band commonly paint their faces white, and white paint was found on the victim's face and hand as well as on her sheet and clothing. Given this proof, a reasonable juror could have found that Fritts was the perpetrator in this case beyond a reasonable doubt.

We also conclude that the evidence is sufficient to establish that Fritts acted with premeditation when he killed the victim. The proof at trial established that the victim suffered at least ten blows with the hatchet prior to her death. Law enforcement found clothes and towels containing the victim's blood and bone fragments in the washing machine, which indicated that Fritts had tried to dispose of some of the evidence related to the murder. In addition, after killing the victim, Fritts hid the hatchet in the attic of the garage and walked to the Git'N'Go convenience store. Despite Fritts's attempt to establish an alibi at the store, Longmeyer and Powell saw Fritts walking away from the victim's home around 4:00 p.m., approximately an hour before Mr. Busler returned home to find the victim deceased. Williams, who was incarcerated with Fritts after the victim's death, testified that Fritts admitted that the victim did not like him because he refused to support his family. Robin Ward, the victim's co-worker, testified that the victim told her the day before her murder that she was afraid of Fritts. Given this evidence, a reasonable juror could have found that the State established all the required elements for first degree premeditated murder. Accordingly, we conclude that the evidence was sufficient to support Fritts's conviction.

*Fritts I*, at *19.

The TCCA properly applied *Jackson* to determine that the evidence was sufficient to support Petitioner's first-degree murder conviction under Tennessee law. First, Petitioner does not seem to challenge the TCCA's finding that the evidence was sufficient for a reasonable jury to find that he perpetrated the murder. But to the extent his petition could be liberally construed to

do so, any such challenge is unpersuasive given the substantial evidence that Petitioner murdered the victim with a hatchet after spraying her with white paint, as the TCCA set forth in its opinion.

Petitioner does challenge the TCCA's finding that the evidence was sufficient to establish his premeditation of the murder, first claiming that the prosecution had only circumstantial evidence of his premeditation [Doc. 1 p. 7; Doc. 22 p. 8]. But circumstantial evidence was sufficient to allow the jury in Petitioner's trial find premeditation under Tennessee law. *State v. Hollis*, 342 S.W.2d 43, 52 (2011) (providing that the issue of whether premeditation existed "is a question of fact for the jury to determine based upon a consideration of all the evidence, including circumstantial evidence surrounding the crime"). And the circumstantial evidence of Petitioner's premeditation of the murder was substantial.

For example, the evidence that Petitioner procured and used a hatchet on the unarmed victim and attempted to hide evidence of that killing supported a finding of premeditation under Tennessee law. *Fritts I*, at 18. Moreover, the evidence of Petitioner's fascination with the band Insane Clown Posse ("ICP") both explained the extraordinarily brutal nature of the murder and supported a reasonable jury finding that Petitioner's use of the white paint and hatchet in the murder were evidence of Petitioner's motive for and planning of the murder, and therefore support the jury finding premeditation. *Id.* Also, the evidence that the victim was afraid of Petitioner, that Petitioner told an inmate that the victim did not like him, and that Petitioner did not render aid to the victim after killing her but instead went to get a drink at a gas station before going to the mall further supported the jury finding premeditation. *Id.*

Additionally, while Petitioner next claims that the only evidence of his premeditation came from the prosecution's gang expert or "speculation," this is not true. First, the prosecution's gang expert was far from the only witness to offer evidence of Petitioner's ICP interest or the obvious

and disturbing correlations between ICP lore and the murder,[2] and a number of witnesses provided testimony to support the jury finding Petitioner premeditated the murder based on other relevant considerations under Tennessee law, such as the victim's dislike and fear of Petitioner and Petitioner's actions after the murder.

Further, while Petitioner correctly points out that the prosecution could not specifically "pinpoint" the time of the victim's death, he cites no case law from which the Court could find that this was required for the jury to find premeditation under Tennessee law, nor has the Court located any such authority. As such, this argument is without merit.

Accordingly, Petitioner has not met his heavy burden to establish that the TCCA's denial of his claim challenging the sufficiency of the evidence to support his first-degree murder conviction was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented, and he is not entitled to § 2254 relief for this claim.

### C. Ineffective Assistance of Counsel

In his § 2254 petition, Petitioner asserts that his trial counsel was ineffective for:

(1)     Failing to object to the introduction of a number of photographs and exhibits;

(2)     Failing to object to the introduction of the 911 tape;

(3)     Failing object to Dustin Dalton's testimony;

(4)     Failing to object to and/or prevent the testimony of Robin Ward;

(5)     Failing to obtain a handwriting expert and/or object to admission of Petitioner's journal;

(6)     Failing to object to admission of a picture of the victim and her husband;

(7)     Failing to object to the state's closing argument at trial and sentencing;

---

[2] As set forth above, Petitioner has not alleged that admission of the gang expert evidence violated his constitutional rights, and any claim that admission of this evidence violated state law is not cognizable under § 2254.

28

(8)     Failing to call Terry Labor to testify as a forensic serologist;

(9)     Failing to object to Dawn Stutler's testimony about an upside-down cross and failing to elicit certain testimony from this witness;

(10)    Failing to pursue a theory of second-degree murder; and

(11)    Failing to present evidence regarding Petitioner's mental state at sentencing;

[Doc. 1 p. 9, 17–19].    Petitioner additionally claims that his post-conviction counsel was ineffective for not providing witnesses to show prejudice for his post-conviction claims and failing to cite case law in his post-conviction appeal [Doc. 1 p. 11; Doc. 22 p. 17].  The Court will address each of these claims in turn, after setting forth the applicable standard of review.

### i. Standard of Review

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  This includes the right to "reasonably effective assistance" of counsel.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.   Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687.  A petitioner has the burden of proving ineffective assistance of his counsel.  *Virgin Islands v. Nicholas*, 759 F.2d 1073, 1081 (3d Cir. 1985).

29

In considering the first prong of *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A party asserting an ineffective-assistance-of-counsel claim must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires a claimant to show counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

The Supreme Court has emphasized that a claimant must establish both prongs of a claim for ineffective assistance of counsel to meet his burden, and if either prong is not satisfied, the claim must be rejected. *Strickland*, 466 U.S. at 69. Moreover, a habeas petitioner alleging ineffective assistance of counsel bears a heavy burden, given the "doubly deferential" review of a such a claim under § 2254(d)(1). *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

### ii. Failing to object to the introduction of a number of photographs, exhibits, and DVDs (3a)

Petitioner first claims that trial counsel was ineffective for failing to object to Exhibits 11-16, 18, 19 (B)-(D), 33(B)-(C), 37(B)-(G), 87(B)-(P), 88, 95-97, 102, 103, 113, and 115 [Doc. 1 p. 17]. He also claims that counsel should have objected to collective exhibit 167, which was a power point presentation, and an exhibit containing DVD recordings[3] because they "were inflammatory

---

[3] Petitioner's descriptions of Collective Exhibit 167, which was a power point presentation, and the exhibit with the DVD recordings, which was Collective Exhibit 20 [Doc. 1 p. 17], is

30

and only used to excite the [j]ury's emotions to gain a conviction" [*Id.*]. The TCCA denied this

claim by stating as follows:

> The admission of photographs is generally discretionary with the trial court and, absent an abuse of that discretion, will not result in the grant of a new trial. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). However, a photograph must be relevant to an issue that the jury must decide before it may be admitted into evidence. *State v. Vann*, 976 S.W.2d 93, 102 (Tenn. 1998); *State v. Braden*, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993); *see also* Tenn. R. Evid. 401, 402. Evidence that is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). Additionally, the probative value of the photograph must outweigh any unfair prejudicial effect that it may have upon the trier of fact. *Vann*, 976 S.W.2d at 102–03; *see also* Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]"). Certainly photographs of crime victims who suffer serious bodily injury are, by their very nature, prejudicial; however, a prejudicial photograph is not per se excludable. Evidence which is unfairly prejudicial, having an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one is excludable. *Banks*, 564 S.W.2d at 951. "The general rule ... is that photographs of a murder victim's body are admissible if they are 'relevant to the issues on trial, notwithstanding their gruesome and horrifying character.'" *State v. Carter*, 114 S.W.3d 895, 902 (Tenn. 2003) (quoting *Banks*, 564 S.W.2d at 950–51). The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Advisory Comm. Cmts.). In *Banks*, the Supreme Court gave trial courts guidance for determining the admissibility of relevant photographic evidence and determined that a trial court should consider the following: (1) the accuracy and clarity of the picture and its value as evidence; (2) whether the picture depicts the body as it was found; (3) the adequacy of testimonial evidence in relating the facts to the jury; and (4) the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. *Id.* at 951. "Moreover, the admissibility of photographic evidence does not depend upon the defendant's offer to stipulate to the facts depicted therein." *State v. Carruthers*, 35 S.W.3d 516, 577 (Tenn. 2000).

> At trial, during a jury[-]out hearing, Dr. Adele Lewis, a forensic pathologist, testified with regard to many of the photographs about which Petitioner now complains. During the initial jury-out hearing, the trial court started to examine each individual photograph numbered 88–107. Trial counsel explained that he did not object to the photographs for the purposes of the jury-out hearing, explaining

---

somewhat confusing. But the Court interprets this claim to raise the same argument Petitioner raised in his appeal to the TCCA [Doc. 13-45 p. 7, 22–24].

that he "didn't necessarily have a problem" with the introduction of the photographs if they were entered for a purpose other than to cause the jury to be inflamed. The trial court determined that it could not make a determination as to the admissibility of the photographs without going through the doctor's testimony in the jury-out hearing and chose instead to allow the State to attempt to introduce the photographs one by one during the testimony of the doctor. At that time, trial counsel would have the ability to object to each individual photograph if he so desired.

The jury was called back in and the testimony of the medical examiner began. The record reflects that trial counsel did not object to trial exhibits 11–16, 18, 19(B)–(D), 33(B)–(C), 37(B)–(G), 87(B)–(P), 88, 95, 96, 97, 102, 103, and 115, all depicting various images of the victim's body both at the crime scene and during the autopsy. Trial counsel objected to trial exhibit 104 (a photo depicting the victim's head injuries). The trial court held a jury-out hearing, during which the trial court found trial exhibit 104 duplicitous of trial exhibits 37 E and F. The trial court ordered a portion of trial exhibit 104, depicting brain matter, redacted. The trial court commented during the hearing that there were "audible sounds" from the jury as some of the pictures were shown. Trial counsel also objected to trial exhibit 113 (a photo of the victim lying face down on the morgue table depicting the victim's left shoulder with crescent shaped bruises indicating bite marks). The trial court overruled the objection. Collective trial exhibit 20 contained two DVDs of the crime scene and was introduced through the testimony of a member of the crime scene team. The DVDs included visual representation of items identical to those depicted in photographs admitted through the medical examiner and blood spatter analysis expert. Collective trial exhibit 167 contained a PowerPoint presentation of many of the same photographs that had already been introduced into evidence. This exhibit was introduced during the testimony of the blood spatter analysis expert in order to explain her conclusions with regard to the manner of death of the victim.

At the post-conviction hearing, trial counsel testified that it was his practice to object to highly prejudicial photographs. Trial counsel also explained that Petitioner's "position throughout the course of this trial was that he did not commit this offense" so trial counsel did not find "white-washing the fact that this victim was brutally murdered" to be a good or reasonable trial strategy. Trial counsel also commented that the DVDs of the crime scene helped to show the "sloppy" job that the officers did during the investigation, including the fact that there were numerous cats wandering through the crime scene. Trial counsel opined that it was beneficial for the defense to cast light on the inadequacy of the investigation. The post-conviction court accredited the testimony of trial counsel, stating:

[O]n failing to object to certain photographs; the [c]ourt ruled to the admission of each of these photographs in this case. And the [c]ourt would remind counsel that under State versus Davidson, 509 S.W.3d 156, in murder prosecution post mortem photographs can be helpful to show how the victim died and the nature of the injuries inflicted before death. These pictures can be relevant to the issue of deliberation or pre-meditation. Intent to kill may be inferred from the brutality of the attack. The succession of blows, the patently vicious manner they are inflicted. The enormity of the cruelty and the horrendous injury suffered provide evidence of willful execution of an intent to kill. That's exactly, I've never had a case like this. Again, I've never had one like this. It was horrific.... [T]he [c]ourt made a ruling at the time. Counsel made the appropriate objections. The [c]ourt allowed only those photographs as it pertained to the scene of the crime that the [c]ourt deemed appropriate for the reasons as set out in State versus Davidson.

There has been no testimony today of exhibits that would inflame the jury, other than the implication that the photographs would inflame the jury.

We have viewed the photographs and exhibits in question. Without a doubt, there are many gruesome and horrific photographs contained within the technical record. However, it would be difficult, if not impossible, in our view for any photograph depicting such a brutal murder to be anything but horrific. The victim in this case, no doubt, was murdered with unnecessary cruelty and savageness. In our view, the admission of exhibits 19, 37, 87, 88, Collective Exhibit 20, and Collective Exhibit 167 in particular could be viewed as needlessly cumulative when combined with the overwhelming evidence of guilt and the ability of the medical examiner and other experts to testify as to the sheer atrocity of the victim's death without the addition of these photographs. Despite our characterization of the photographs, however, we take note that seasoned trial counsel reviewed the photographs and made the strategic decision not to accentuate the seriousness of the offense by repeatedly objecting to evidence based on the fact that Petitioner repeatedly insisted that he was not the perpetrator of the crime. The fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

The post-conviction court determined that trial counsel "exhausted" his investigation of the case and the court accredited trial counsel's testimony before concluding that trial counsel was not ineffective for failing to object to the photographs, DVDs, and PowerPoint presentation. The post-conviction court also

discussed the overwhelming evidence pointing to Petitioner's guilt, including the fact that the pants and shoes worn by Petitioner at the time he was questioned contained the victim's blood. Moreover, Petitioner did not introduce any testimony at the hearing to show how he was prejudiced by the introduction of the photographs or that the outcome of the proceeding would have been different had the photographs been excluded. Petitioner has failed to meet his burden with regard to this issue and is not entitled to relief.

*Fritts II*, at *6–8.

The TCCA properly found that Petitioner was not entitled to relief for this claim. Like the TCCA, the Court has reviewed the relevant exhibits to the trial, and this Court has also reviewed the entire state court record. While the relevant exhibits were undoubtedly prejudicial, they also showed the brutality of the killing, which, as set forth above and as the post-conviction court noted, was relevant to establishing Petitioner's premeditation. And while the Court agrees with the TCCA that some portion of the exhibits may have been cumulative, Petitioner's counsel explained that he chose not to object to the crime scene DVD recordings at trial because he thought they may assist the defense by showing a sloppy investigation. Petitioner's counsel also testified that he did not object to other exhibits because such objections would not have been consistent with the defense's theory that Petitioner did not commit the murder, which Petitioner insisted on pursuing. This Court will not second guess counsel's strategic decisions under these circumstances. *See Strickland v. Washington*, 466 U.S. 668, 690–91 (1984) (noting that counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"); *Burton v. Renico*, 391 F.3d 764, 774 (6th Cir. 2004) (holding that "strategic choices by counsel, while not necessarily those a federal judge in hindsight might make, do not rise to the level of a Sixth Amendment violation").

Also, the Court, like the TCCA, cannot find a reasonable probability that, even if Petitioner's trial counsel had successfully objected to some portion of the relevant photos and/or

34

exhibits as cumulative, the result of Petitioner's trial would have been different, given the overwhelming evidence of Petitioner's guilt.

Accordingly, Petitioner has not established that his trial counsel's failure to object to the relevant photos and exhibits was deficient performance that caused him prejudice, or that the TCCA's denial of this claim was based on an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. As such, he is not entitled to relief under § 2254 for this claim.

### iii. Failure to Object to the 911 Call Recording

Petitioner next asserts that trial counsel was ineffective for not objecting to admission of the recording of Steve Busler's 911 call at his trial as irrelevant and hearsay [Doc. 1 p. 17; Doc. 22 p. 10]. The TCCA addressed this claim as follows:

> The tape of the 9–1–1 call was introduced during the testimony of Mr. Busler. He testified that he found the victim and ran next door to call 9–1–1 because the home did not contain a landline. In the 9–1–1 tape, Mr. Busler first sounds frantic. Towards the end of the call, Mr. Busler sounds calm. Mr. Busler was initially interviewed as a suspect in the crime. Trial counsel explained that he wanted the jury to hear the call because it helped to "point the finger" at someone else for the crime where the defense theory was that Petitioner was not the perpetrator. The post-conviction court determined that the 9–1–1 tape "candidly put a dent in the State's proof" because Mr. Busler "started out emotional but ended up calm." However, the post-conviction court concluded that Petitioner failed to prove that trial counsel was ineffective for failing to object to the introduction of the tape. We agree. Petitioner[] has failed to show how the introduction of the tape was prejudicial. Petitioner is not entitled to relief on this issue.

*Fritts II*, at *8.

The Court agrees with the TCCA that Petitioner is not entitled to relief for this claim. Petitioner's trial counsel testified that he did not object to the 911 recording for strategic reasons, as he thought the recording may incriminate Mr. Busler, who initially sounds "frantic" on that call before calming down towards the end. Again, the Court will not second guess counsel's strategy,

35

especially where this strategy was plainly reasonable. Moreover, the Court cannot find that Petitioner suffered any prejudice as a result of counsel's failure to object to the 911 recording.

As such, Petitioner has not established that his counsel's failure to object to the 911 recording was deficient performance that prejudiced him or that the TCCA's denial of this claim was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented, and he is not entitled to relief under § 2254 for this claim.

### iv. Dustin Dalton

Petitioner next claims that trial counsel was ineffective for not objecting to Dustin Dalton's testimony regarding certain lyrics from Petitioner's journal, as the state did not prove the writing in the journal belonged to him [Doc. 1 p. 17; Doc. 22 p. 10]. The TCCA denied this claim. *Fritts II*, at *9.

Petitioner appears to be referring to Mr. Dalton's testimony that, while they were in jail together, Petitioner showed some song lyrics to Mr. Dalton that Petitioner had written [Doc. 13-14 p. 93–94]. According to Mr. Dalton, the lyrics Petitioner showed him "sounded like they were ICP. Talking about hacking your brains out and I'll cut your f-ing head off and stuff" and "talking about . . . I'll split your wig open, you know, stuff like that" [Doc. 13-14 p. 93–94, 95].

Both Petitioner and the TCCA characterize this testimony as referring to lyrics written in the journal that was the subject of much scrutiny during Petitioner's trial [Doc. 1 p. 17]. *Fritts II* at *9. However, in its detailed review of the entirety of Mr. Dalton's testimony [Doc. 13-14 p. 93–101], the Court noted that while Mr. Dalton at one point referred to Petitioner having written the relevant lyrics on "papers," he did not refer to any journal, much less the specific journal about which other witnesses testified at trial. To the contrary, Mr. Dalton's testimony strongly suggested

that Petitioner wrote down the relevant lyrics, from memory or as a creative endeavor, while he was in jail and presumably would not have had his journal [*Id.* at 94–95].

Regardless, however, Petitioner has not established that his counsel was ineffective for failing to object to Mr. Dalton's testimony about these lyrics. Petitioner does not offer a valid objection his counsel could have made to this testimony. But even if the Court assumes without finding that Petitioner's counsel could have successfully objected, the Court cannot find a reasonable probability that the result of Petitioner's trial would have been different if the jury had not heard this evidence, given the overwhelming evidence of Petitioner's guilt.

As such, Petitioner has not established that his counsel's failure to Mr. Dalton's testimony was deficient performance that prejudiced him or that the TCCA's denial of this claim was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented, and he is not entitled to relief under § 2254 for this claim.

### v. Robin Ward

Petitioner also claims that his counsel was ineffective for "fail[ing] to prevent the testimony of Robin Ward," as her testimony was hearsay. The TCCA denied this claim by stating as follows:

> At trial, prior to the testimony of Ms. Ward, trial counsel lodged an objection on the basis that the testimony was hearsay. During a jury-out hearing, the trial court determined that Ms. Ward's testimony that the victim told her she was afraid of Petitioner was admissible. At the post-conviction hearing, the post-conviction court noted that there was "an 803 hearing" during which the court ruled the testimony admissible. The post-conviction court determined that trial counsel acted appropriately by objecting to the testimony and having a hearing. The fact that the objection itself was unsuccessful does not render counsel's actions ineffective assistance. The post-conviction court determined that Petitioner failed to meet his burden and was not entitled to relief. We agree. Petitioner has failed to show how trial counsel's actions resulted in prejudice.

*Fritts II*, at *9.

Petitioner has not shown that this was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. As the TCCA noted, the record establishes that Petitioner's counsel tried to exclude Ms. Ward's testimony and was unsuccessful, as the trial court determined that Ms. Ward's testimony was admissible as an exception to Rule 803 of the Tennessee Rules of Evidence regarding hearsay [Doc. 13-13 p. 102–108]. To the extent that Petitioner challenges the trial court's decision to allow this evidence based on its interpretation of Rule 803, that claim is not cognizable herein. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Koryal v. Schroeder*, No. 20-1952, 2021 WL 3179410, at *2 (6th Cir. 2021) (declining to issue a certificate of appealability for claim that the criminal court's admission of hearsay evidence was error, as "[c]laims regarding state evidentiary law are generally non-cognizable on habeas review") (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Thus, Petitioner has not established that his counsel's failure to Mr. Dalton's testimony was deficient performance that prejudiced him, and he is not entitled to relief under § 2254 for this claim.

### vi. Journal

Petitioner next claims that counsel was ineffective for not obtaining a handwriting expert to prove that handwriting in a journal was not Petitioner's and/or objecting to entry of the journal [Doc. 1 p. 17; Doc. 22 p. 11]. The TCCA stated as follows in denying this claim:

> At the hearing, trial counsel testified that he called Petitioner's wife and mother who both testified that there were portions of the journal that were not written by Petitioner. Trial counsel opined that this was the best strategy to discredit the authenticity of the journal where there were clearly entries written by more than one person rather than to risk an expert coming to the conclusion that Petitioner himself authored all of the entries in the journal pertaining to murder and mayhem.
>
> The post-conviction court determined that trial counsel did "the best thing he could have done" by cross-examining Petitioner's own mother and wife and getting proof into the record that some of the handwriting in the journal did not belong to Petitioner. In fact, the Tennessee Supreme Court recently recognized that in most cases, "the decision to select an expert, or which expert to select, constitutes one of

38

the 'strategic' defense decisions that *Strickland v. Washington* shields from scrutiny." *Kendrick v. State*, 454 S.W.3d 450, 475 (Tenn. 2015). Trial counsel herein made the strategic decision in this case to forego a handwriting expert. Again, this Court will not use hindsight to second-guess a reasonable trial strategy. *Adkins*, 911 S.W.2d at 347. Petitioner has failed to show that trial counsel was ineffective in utilizing this trial strategy. Consequently, Petitioner is not entitled to relief on this issue.

*Fritts II*, at *9.

Again, the TCCA properly found that Petitioner is not entitled to relief for this claim. While Petitioner insists that the graphic lyrics in the journal were not his handwriting, Petitioner's counsel had two witnesses testify in accordance with that position. Counsel reasonably determined that this was better than hiring a handwriting expert, as such an expert may have concluded that the graphic lyrics indeed were Petitioner's handwriting. And the Court further notes that, as Respondent points out, Petitioner has never produced evidence from a handwriting expert that the graphic lyrics in the journal are not in his handwriting. Thus, Petitioner has not established that his trial counsel's failure to obtain a handwriting expert was deficient performance, or that this omission prejudiced him.

Moreover, while Petitioner alleges that his counsel was ineffective for not objecting to entry of the journal, he does not identify a valid objection his counsel could have made to this evidence, nor can the Court find that a reasonable probability exists that the result of Petitioner's trial would have been different without entry of the journal into evidence, given the other overwhelming evidence of Petitioner's guilt.

As such, Petitioner has not established that his counsel provided deficient performance that prejudiced him with regard to Petitioner's journal, or that the TCCA's denial of this claim was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented, and he is not entitled to relief under § 2254 for this claim.

### vii. Photograph

Petitioner also claims that counsel was ineffective for not objecting to the prosecution's introduction of a photograph of the victim with her husband while she was alive into evidence, specifically stating that this photo [Doc. 13-22 p. 81] was admitted only to arouse the sympathy of the jury and was highly prejudicial "[w]hen viewed in contrast with other gruesome photographs [of the victim] introduced at trial" [Doc. 1 p. 18; Doc. 22 p. 11–12]. The TCCA stated as follows in denying this claim:

> Trial counsel testified that the trial court ordinarily allowed these types of photos to "give some historical perspective to the jury in deciding the case." The post-conviction court noted that it was the "law in Tennessee" that parties can "introduce" such photographs into evidence. While we recognize that the Tennessee Supreme Court has held that these types of photographs are ordinarily irrelevant and fraught with the ability to arouse sympathy in the minds of jurors, the introduction of photographs taken during the life of a victim are not so prejudicial as to warrant a new trial. *See, e.g. State v. Adams*, 405 S.W.3d 641, 657–58 (Tenn. 2013) (citing *State v. Cole*, 155 S.W.3d 885, 912 (Tenn. 2005)). Moreover, Tennessee Code Annotated section 40–38–103 permits the introduction of "an appropriate photograph of the victim while alive ... to show the general appearance and condition of the victim while alive" in a "prosecution for any criminal homicide." The photograph herein depicted the victim and her husband. Petitioner has failed to establish that trial counsel's failure to object to the introduction of the photograph was prejudicial. Petitioner is not entitled to relief on this issue.

*Fritts II*, at *10.

Petitioner has not shown that this was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. Petitioner's counsel was aware that the trial court regularly admitted photos of this nature, and Petitioner has not established that any objection by counsel to this picture would have been successful, or that there is a reasonable probability that the result of his trial could have been different if the trial court had not admitted this picture, in light of the overwhelming evidence of Petitioner's guilt. Thus,

Petitioner has not established that counsel's failure to object to this picture was deficient performance that prejudiced him, and he is not entitled to relief under § 2254 for this claim.

### viii. Closing Argument

Petitioner next challenges his counsel's failure to object to the prosecution's closing arguments at trial and sentencing [Doc. 1 p. 18; Doc. 22 p. 12–13]. The TCCA stated as follows in denying this claim:

> Petitioner complains that trial counsel failed to object during closing arguments when the prosecutor stated that in her opinion Petitioner thought the victim was dead, started to clean up the scene, saw the victim move, said "oh my God, she's still alive!", and then continued to beat her with the hatchet. Petitioner also argues that trial counsel should have objected during the sentencing phase when the prosecutor suggested that the victim moved after she was initially beaten and felt "pain." The State disagrees, arguing that trial counsel explained that he was familiar with the prosecutor's argument style and addressed it in his own closing rather than objecting and drawing attention to the dramatic style employed by the prosecutor.
>
> Specifically, Petitioner is complaining about trial counsel's failure to object to the following argument:
>
>> At that point he takes the hatchet and he starts hitting her on the head. I think she goes unconscious, she's bleeding bad lying there in the blood and I think he thinks she's dead. So he goes off and starts to clean up things and he comes back and sees her move. Why do we know she moved? We know that she laid on that bed for six to eight minutes because that blood spatter person told you it takes six to eight minutes to coagulate and you've got that coagulation on the bed and that big pool of saturation. That blood handprint is either the defendant's handprint where he's bracing himself while he swings. Or maybe it's [the victim's] eking up every ounce of energy she can to push herself up. We know that her blood[y] head, a very, very bloody object, dropped those drops of blood on the envelopes and on the counter and down this dresser. This was a very, very bloody move. I submit to you this evidence suggests that she somehow gets herself up, she is bleeding over all of this, she falls maybe to her knees because we've got more blows delivered down and the defendant said, on, my God, she's still alive! And that's when he just whales away.

Case 3:19-cv-00031-RLJ-JEM   Document 26   Filed 02/28/22   Page 41 of 51   PageID #: 3527

During the sentencing phase, the prosecutor commented that Petitioner tired himself out during the beating and had to rest, that it was "something that went on for a while." She also commented that Petitioner "beat her here—from the spatter—and then he finished her off. She moved. Consciousness, feeling, pain, wicked behavior."

Trial counsel explained at the post-conviction hearing that he was familiar with the prosecutor's argument style and chose to address her penchant for drama in his own closing rather than objecting to her theories of the case. It is clear that trial counsel strategically decided that it was better to refrain from an objection rather than to object and potentially draw more attention to the matter. Additionally, trial counsel knew that the jury would receive an instruction that argument was not the same as evidence. The post-conviction court reviewed the jury instructions during which the court told the jury that the "statements, arguments or remarks of counsel are intended to help you in understanding the evidence and applying the law but they are not evidence. The jury instructions also told the jury that to disregard "statements [that] were made that ... [were] not supported by the evidence." The post-conviction court determined that Petitioner failed to show prejudice in light of the overwhelming proof of guilt in this case. We agree. Petitioner cannot say that the result of the proceedings would have been different if the State's closing argument or sentencing argument were excluded. Petitioner has failed to meet his burden and is not entitled to relief on this issue.

*Fritts II*, at *10.

Petitioner has not established that this was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. Petitioner's counsel was aware of the prosecutor's dramatic style and reasonably chose to undermine it and rely on the jury instruction that arguments by counsel are not evidence, rather than object to it.

In his reply, Petitioner cites *Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005) to argue that the TCCA made an unreasonable determination regarding counsel's failure to object to the prosecutor's argument. But that case is highly distinguishable from this one. Specifically, in *Hodge*, the Sixth Circuit found that a defense attorney provided ineffective assistance of counsel where he failed to object to or otherwise address various improprieties in the prosecution's closing argument, specifically the prosecutor repeatedly commenting on the credibility and bad character of certain witnesses and misrepresenting to the jury that an acquittal would mean deciding that

42

some witnesses were liars, in a "close case at the trial level" that came down to a determination of the credibility of two witnesses. *Hodge*, 426 F.3d at 377–389. However, unlike in *Hodge*, the prosecutor's challenged statements in Petitioner's case did not infer or address the credibility or bad character of any witness but rather set forth the prosecutor's interpretation of the evidence introduced at trial. And notably, Petitioner's case was not close at the trial level, unlike *Hodge*.

Thus, Petitioner has not established that counsel's failure to object to the prosecutor's closing arguments at trial and sentencing was deficient performance that prejudiced him, and he is not entitled to relief under § 2254 for this claim.

### ix. Terry Labor

Petitioner next challenges his trial counsel's failure to call Terry Labor as a defense witness [Doc. 1 p. 18; Doc. 22 p. 13]. The TCCA stated as follows in denying this argument:

> Petitioner argues on appeal that trial counsel should have called Terry Labor to testify as a forensic serologist to rebut the testimony from the State's expert that the victim laid on the bed for six to eight minutes after her initial injury. Specifically, Petitioner points to Mr. Labor's conclusion that the "length of time" the victim was on the bed prior to the final resting position on the floor "could not be determined." Petitioner insists that his testimony would have cast doubt on the prosecution theory.

> At the post-conviction hearing, trial counsel testified that he did not call Mr. Labor as a witness because he determined that the testimony would be more helpful to the State than to the defense. Trial counsel again explained that Petitioner insisted that he did not commit the offense and that Mr. Labor's testimony did not assist in advancing this theory. The post-conviction court accredited the testimony of trial counsel in this regard, concluding that it was a trial strategy and noting that there was overwhelming evidence that Defendant committed the crime. The evidence does not preponderate against the post-conviction court's conclusion with regard to this issue. Additionally, we note that Petitioner failed to call Mr. Labor to testify at the post-conviction hearing. Without his testimony, Petitioner cannot establish prejudice. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). Petitioner is not entitled to relief on this issue.

*Fritts II*, at *11.

Petitioner has not established that this was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. Petitioner's counsel determined that Mr. Labor's testimony would not assist the defense, and Petitioner has not established that his was an unreasonable conclusion, nor has he ever presented Mr. Labor as a witness. *See, e.g., Stewart v. Wolfenbarger*, 468 F.3d 338, 353 (6th Cir. 2006) (finding that the state courts' conclusion that a petitioner had failed to present proper evidence of what a witness's testimony would have been if he testified "was not contrary to or an unreasonable application of clearly established law"). Additionally, in light of the overwhelming evidence of Petitioner's guilt, the Court cannot find a reasonable probability that testimony from Mr. Labor that the amount of time victim was on the bed before reaching the floor "'could not be determined'" would have changed the result of Petitioner's trial.

Thus, Petitioner has not established that counsel's failure to present Mr. Labor at trial was deficient performance that prejudiced him, and he is not entitled to relief under § 2254 for this claim.

### x. Dawn Stutler Testimony

Petitioner next challenges his trial counsel's failure to object to Dawn Stutler's testimony that an upside-down cross can mean bad, and possibly satanic, things and trial counsel's failure to elicit testimony from Dawn Stutler that she was the one who tried to obtain access to the murder scene after the murder [Doc. 1 p. 18; Doc. 22 p. 13–14]. The TCCA stated as follows in denying Petitioner relief for these arguments:

> At the hearing, Petitioner testified that he told trial counsel that he did not attempt to gain entry to the house after the murder. Trial counsel testified that whether someone tried to break in to the house a week after the murder was not relevant to the ultimate question of who murdered the victim. With regard to the drawing on

44

the journal, trial counsel testified that he did not want to draw any unnecessary attention to the symbol or suggest to the jury that it was somehow important and that objecting to [Dawn Stutler]'s testimony might somehow make it seem important. Again, the post-conviction court accredited the testimony of trial counsel and determined that trial counsel "exhausted" his investigation of the case. The evidence does not preponderate against the judgment of the post-conviction court that trial counsel made a strategic decision with regard to the testimony of [Dawn Stutler]. Moreover, Petitioner has failed to show how any alleged failure of trial counsel resulted in prejudice. Petitioner is not entitled to relief on this issue.

*Fritts II*, at *11.

Petitioner has not established that this was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. Petitioner's counsel reasonably determined that the attempt to break in the Buslers' house was not relevant to the jury determining who murdered the victim. And the evidence that Petitioner murdered the victim was overwhelming. As such, the Court cannot find a reasonable probability that the result of Petitioner's trial would have been different if Dawn Stutler had testified that she attempted to break in the Buslers' house. Additionally, it was reasonable for counsel to decide not to draw additional attention to the testimony regarding the upside-down cross by objecting. And again, in light of the overwhelming evidence of Petitioner's guilt, the Court cannot find a reasonable probability that, if counsel had objected to this testimony, it would have changed the result of Petitioner's trial.

Thus, Petitioner has not established that counsel's failure to object to Dawn Stutler's testimony regarding an upside down cross or his failure to elicit testimony from Dawn Stutler regarding her attempt to break in the house was deficient performance that prejudiced Petitioner, and he is not entitled to relief under § 2254 for this claim.

45

### xi. Second-Degree Murder

Petitioner next challenges his trial counsel's "fail[ure] to pursue a theory of second-degree murder as alternative defense/theory" [Doc. 1 p. 19; Doc. 22 p. 13].  The TCCA stated as follows in denying this argument:

> Trial counsel testified that Petitioner insisted that he did not commit the crime.  In trial counsel's opinion, the only way to get second degree murder in front of the jury would be for Petitioner to admit that he killed the victim.  Trial counsel expressed regret that he was unable to convince Petitioner to pursue this defense at trial.  Trial counsel acknowledged that he mentioned second degree murder during closing argument but was of the opinion that if he argued too strongly for a second degree murder conviction it would contradict the defense theory of the case.
>
> The post-conviction court noted that Petitioner maintained his innocence.  The court again accredited trial counsel's testimony, determining that trial counsel thoroughly investigated the case and developed a trial strategy coinciding with Petitioner's wishes.  Petitioner has failed to show prejudice as a result of this trial strategy.  As a result, Petitioner is not entitled to relief on this issue.

*Fritts II*, at *12.

Petitioner has not established that this was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented.  As the TCCA noted, the record establishes that Petitioner's counsel wanted to pursue the theory of second-degree murder, but Petitioner insisted he did not kill the victim and did not want his counsel to argue for second-degree murder, and Petitioner's counsel therefore concluded that he could not pursue second-degree murder as a theory.

While Petitioner asserts that counsel still should have asserted second-degree murder as an alternative defense, Petitioner's chosen theory that he did not commit the murder so contradicts the theory that he did so as second-degree murder that Petitioner's counsel reasonably felt that such a strategy may appear disingenuous to the jury.  And the record establishes that Petitioner's counsel nevertheless brought up second-degree murder in his closing argument in an attempt to

46

give the jury the option to fall back on that option as an alternative. Thus, considering all of the relevant circumstances as a whole, Petitioner has not established that his counsel was deficient with regard to pursuing the theory of second-degree murder. Nor does the Court find that Petitioner has established that his counsel's decision not to actively pursue the theory of second-degree murder as an alternative defense theory prejudiced him, especially in light of the substantial evidence of Petitioner's premeditation of the murder, as set forth above.

Moreover, while Petitioner generally asserts in his reply that he had a Fifth Amendment right not to admit his guilt for the murder, Petitioner has not established that the TCCA's determination that he was not entitled to relief for this claim was unreasonable in light of this right.

Thus, Petitioner has not established that counsel's failure to pursue second-degree murder as an alternative theory was deficient performance that prejudiced him, and he is not entitled to relief under § 2254 for this claim.

### xii. Mental State

Petitioner next challenges his trial counsel's failure to call an expert witness to testify that Petitioner was emotionally disturbed [Doc. 1 p. 18; Doc. 22 p. 13]. The TCCA stated as follows in denying this argument:

> Petitioner argues that trial counsel was also ineffective for failing to call Dr. Vance R. Sherwood or school psychologist Michelle Dawson to testify that Petitioner was "emotionally disturbed" when he was eighteen years of age and to "otherwise show that [Petitioner] was emotionally disturbed." The State posits that Petitioner's claim fails because he did not present either witness at the hearing on the post-conviction petition.

> Trial counsel testified at the hearing that after reviewing a report from Dr. Sherwood, he made the determination that the report would have been more beneficial to the State's case than Petitioner's case. Specifically, trial counsel recalled that the report indicated Petitioner failed to take responsibility for his own actions and instead fabricated explanations for his actions that he would then come to believe.

47

The post-conviction court noted that trial counsel consulted with various experts and determined that based on Petitioner's insistence that he did not commit the crime, and the trial strategy employed to advance that theory, there were no experts that would be beneficial at trial. Further, the post-conviction court agreed with trial counsel that Dr. Sherwood's testimony would have been more helpful to the State than to Petitioner.

Petitioner failed to call either Dr. Sherwood or Michelle Dawson to testify at the hearing. Therefore, he is unable to establish prejudice. *See Black*, 794 S.W.2d at 757. Petitioner is not entitled to relief on this issue.

*Fritts II*, at *12.

Petitioner has not established that this was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. Petitioner's counsel reasonably determined that an expert who determined Petitioner was emotionally disturbed was likely to testify in a manner that would benefit the state more than Petitioner. Also, while Petitioner complains that counsel did not call an expert witness to testify at sentencing, he has never presented such a witness to allow the Court to determine that counsel's failure to do so amounted to prejudice.

Thus, Petitioner has not established that counsel's failure to present an expert witness to testify that he was emotionally disturbed was deficient performance that prejudiced him, and he is not entitled to relief under § 2254 for this claim.

### xiii. Post-Conviction Counsel

Petitioner next challenges his post-conviction counsel's failure to provide testimony from witnesses to establish prejudice to Petitioner based on his claims for post-conviction relief and failure to cite case law to support arguments raised on appeal [Doc. 1 p. 11]. In response, Respondent contends that this argument is not cognizable in this action, as Petitioner did not have a constitutional right to effective assistance of post-conviction counsel [Doc. 15 p 34–35]. Respondent also notes that, as Petitioner has not raised any claim for ineffective assistance of counsel that his post-conviction did not raise, he cannot assert a claim based on *Martinez v. Ryan*,

48

566 U.S. 1, 2 (2012) [*Id.*]. In his reply, Petitioner cites *Coleman v. Thompson*, 501 U.S. 722 (1991) and asserts that, as the TCCA found that his post-conviction counsel had not provided certain evidence or case law citations for arguments, he cannot further pursue his claims [Doc. 22 p. 17].

This claim is not cognizable in this action, as Petitioner did not have a constitutional right to effective assistance of counsel in his post-conviction proceeding. *Coleman*, 501 U.S. at 752 (providing that "[t]here is no constitutional right to an attorney in state post-conviction proceedings" and that, therefore, "a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings") (citations omitted). As such, the Court will not address this claim on the merits.

### D. Due Process

Petitioner next claims that the post-conviction court's failure to admit various materials as evidence at his evidentiary hearing violated his right to due process [Doc. 1 p. 18; Doc. 22 p. 18]. However, it is well-established that a writ of habeas corpus "is not the proper means by which prisoners should challenge errors or deficiencies in state post-conviction proceedings . . . because the claims address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration." *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986). Accordingly, the Sixth Circuit Court of Appeals "'has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review.'" *Mendenhall v. Parris*, No. 16-6003, 2017 WL 2819225, at *4 (6th Cir. Feb. 22, 2017) (quoting *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007)). Thus, this claim also is not cognizable in this action, and the Court will not address it on the merits.

49

### E.  Cumulative Error

Petitioner next claims that the cumulative effect of all the errors by his counsel and the trial court entitle him to § 2254 relief [Doc. 1 p. 18; Doc. 22 p. 18].  However, "[t]he Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief."  *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002) (citing *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002)).  Moreover, the Court has not found that any of Petitioner's ineffective-assistance-of-counsel claims have any merit, and where "individual claims are all essentially meritless, [a petitioner] cannot show that the cumulative error[s] violated his constitutional rights."  *Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006) (citing *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000)).  Accordingly, Petitioner is not entitled to relief under § 2254 on this claim.

## IV.  CONCLUSION

For the reasons set forth above, Petitioner's requests for § 2254 relief will be **DENIED**, and this action will be **DISMISSED**.

The Court must now consider whether to issue a certificate of appealability ("COA") should Petitioner file a notice of appeal.  Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas corpus proceeding only if he is issued a COA, and a COA may issue where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2).  Where a district court dismissed claims on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right.  *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack*, 529 U.S. at 484.

50

Reasonable jurists could not conclude that Petitioner has made a substantial showing of a denial of a constitutional right with regard to any of his claims, such that they would be adequate to deserve further review. Accordingly, a **COA SHALL NOT ISSUE.** Also, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. Fed. R. App. P. 24.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

ENTER:

_____
s/ Leon Jordan
United States District Judge

51